IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 17, 2018 Session

## IN RE: SAMUEL R.,[1] ET AL.

**Appeal from the Chancery Court for Shelby County**
**No. CH-14-1417     Jim Kyle, Chancellor**

_____

**No. W2017-01359-COA-R3-PT**

_____

This appeal involves the termination of a father's parental rights to his two children. The father suffers from paranoid schizophrenia. The trial court terminated his parental rights on the grounds of mental incompetence and abandonment by willful failure to visit and/or support. We reverse the trial court's findings regarding abandonment but otherwise affirm the termination of parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in part, Affirmed in part, and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and W. NEAL MCBRAYER, J., joined.

William Ray Glasgow, Memphis, Tennessee, for the appellant, David R.

Adam Noah Cohen, Memphis, Tennessee, for the appellees, Nicholas C. and Julie C.

Laurie Winstead Hall, Memphis, Tennessee, for the appellees, David R. and Nancy R.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

David ("Father") and Julie ("Mother") were married in 2004. They had two children ("Son" and "Daughter"), who were born in 2006 and 2007. Father was

_____

[1]In cases involving minor children, it is this Court's policy to redact names in order to protect the children's identity. In this case, in order to preserve both clarity and the anonymity of the children, we will redact the names of individuals sharing the children's surname and will refer to those individuals by their given name and the first letter of their surname.

physically abusive to Mother on many occasions during the marriage. He was arrested for assaulting Mother in 2007. Father's paranoia and violence escalated in late 2009. In December 2009, Father choked Mother on two occasions until she became numb and disoriented. In early January 2010, Father allegedly brought a rifle into the home and directed Mother to change Son's diaper "for the last time." Father asked if Mother preferred to be shot "up close or far away" and described how he intended to dispose of her body. Father pointed the gun at Mother and instructed her to turn and walk away. Mother slowly walked away as instructed, expecting Father to shoot her. After a few minutes, Father simply put the gun down and sat down on the couch. However, Mother was terrified and left with the children the next morning while Father was asleep.

Mother reported the incident to police, and Father was arrested and charged with aggravated domestic assault. Mother filed a complaint for divorce days later, on January 19, 2010. An order of protection was entered prohibiting Father from contacting Mother or the children. Father was admitted to a mental health institute for an evaluation of his competence to stand trial and mental state at the time of the offense. Father was examined by professionals who certified that Father was, in their opinion, mentally ill, that he posed a substantial likelihood of serious harm, and that he was in need of care and treatment in a mental hospital. Father was diagnosed with schizoaffective disorder. Based on the evaluation, the criminal court entered an order finding that Father was incompetent to stand trial because of mental illness and that he met the relevant statutory criteria for commitment and judicial hospitalization at the mental health institute. The criminal charge against Father was dismissed.

After further evaluation and treatment, the staff at the mental health institute determined that Father no longer met the standards for judicial commitment, and he was released into the custody of his father ("Grandfather") around June 2011. Father lived with his parents thereafter. The final decree of divorce was entered on or about July 5, 2012. Father had not seen the children since Mother left the marital home with them in January 2010. Father and Mother entered into an agreed parenting plan, which provided that if Father's primary psychologist, Dr. John Leite, provided written assurance that Father was in an appropriate mental state to exercise supervised parenting time with the children, Father would be allowed "two hours of supervised parenting time per week" over the course of twelve sessions at the Exchange Club. If Father successfully exercised this supervised parenting time, his parents would supervise thereafter, and parenting time could be expanded as the court deemed appropriate.

On August 21, 2012, Dr. Leite wrote a letter stating that he was working with Father in individual psychotherapy and felt quite comfortable that Father was in an appropriate mental state to exercise supervised parenting time. Father's supervised visits at the Exchange Club began on October 20, 2012. By that time, the children were ages six and five, and they had not seen Father in nearly three years. The visits did not go well. Father was late for the first one-hour visit. He made comments that the supervisor deemed inappropriate and negative. When the supervisor attempted to discuss the issue with Father, their conversation continued to the point that security stopped the visit and escorted Father out of the building. Additional supervised visits were scheduled for one hour every other week.[2] Father did not show up for the second visit, although Mother and the children were there. He failed to show up for another scheduled visit in February 2013. Father attended six more supervised visits between November 2012 and April 2013 without incident, but he was late to four of those six one-hour visits.

Father's eighth and final supervised visit took place on April 20, 2013. Again, Father was late. During the visit, Son asked for a red drink, and Father gave him one. Daughter said that Son was not supposed to have red drinks because they make him hyper. According to Exchange Club records, Father stated that was "the stupidest thing he had ever heard." When Daughter repeated herself, Father "raised his arms" and told the children that they were with their dad and could do what they want. Father told the children they were being brainwashed. The supervisor intervened, but Father continued to make snide and sarcastic remarks. Father started to argue with the supervisor, who asked Father to change the subject. Then, Father asked the children what they hated most about Mother. The supervisor immediately ended the visit. As the supervisor and the children were walking toward the elevator, Father continued to direct questions to the children and complain about not getting his money's worth out of the visit. Both children were visibly upset. According to Exchange Club records, Father was argumentative, sarcastic, and had an overall negative attitude, raising his voice and using "intimidating body language."

A few days later, the Director of Visitation Services at the Exchange Club contacted Father to discuss the incident and the children's perception of his behavior. She informed Father that the children reported to their therapist that Father was mean during the visit and said they should hate things about Mother. According to the

---

[2]Mother testified that the visits did not occur as often as described in the parenting plan because the Exchange Club was so busy that it could not accommodate scheduling weekly two-hour visits for twelve weeks. The Exchange Club's Director of Visitation Services could not recall precisely why the visits were scheduled as they were, but she testified that the Exchange Club had a very heavy caseload at that time and that appointments were scheduled based on availability.

Director, Father was unable to comprehend how his behavior was negative or how the children were affected by his behavior. When asked if he was willing to apologize to the children, Father responded that he saw no reason to do so and that he would not be returning to visit with them at the Exchange Club. The Director encouraged Father to understand how his children experienced the visit and to continue visiting, but Father was adamant and insisted that he would not continue visiting at the Exchange Club.

Three months went by with no contact between Father and the children. In July 2013, Grandfather and his wife ("Grandmother") jointly filed a petition to appoint a conservator for Father in probate court. A copy of the petition was mailed to the children at Mother's residence. Grandparents' petition alleged that Father was unable to manage his day-to-day affairs due to mental infirmity. They alleged that Father was diagnosed with paranoid-type schizophrenia and had become "continually more delusional and unreasonable" in his actions. According to the petition, Father was still residing with Grandparents and refused to be examined by a physician or take his medication as prescribed. Grandparents alleged that Father's situation had recently become much worse and that they were concerned for their safety due to Father's verbal abuse and "increasingly delusional state of mind." They claimed that Father's ability to reason and handle his affairs was non-existent.

During the conservatorship proceeding, Dr. Leite submitted an affidavit stating that Father was not competent to manage or control himself and his affairs, as he was exhibiting delusions of persecution and conspiracy with significantly impaired judgment and insight. The probate court entered an order in October 2013 appointing Grandparents as co-conservators of the person and the estate of Father, finding that Father was a disabled person by reason of mental illness. The order removed from Father and transferred to Grandparents "[t]he right to prosecute and to defend lawsuits; [and] the right to advance [Father's] rights to visitation, or parenting time, with his minor children."

In their capacity as conservators, Grandparents obtained the records from the Exchange Club regarding Father's supervised visitation. However, they did not file any petition or ask Mother to reinstate Father's visitation. In November 2013, Grandfather wrote a letter to Mother advising her of the conservatorship and their authority to act on Father's behalf regarding the parenting plan. Regarding Father, the letter stated,

> It certainly seems evident at this point that [Father] will be disabled for the foreseeable future because of his illness, however, we plan to attempt to get

him the medical attention he needs to become more functional and hopefully maintain a relationship with [Son] and [Daughter] in the coming years.

. . . .

. . . At this time we don't feel [Father] is well enough to visit with them for even a short period of time and we won't allow him to visit them without your consent or if we feel he is not well enough for a visit. . . .

. . . I would also ask that you or your family refrain from contacting or conversing with [Father] due to his illness, any contact will only increase stress on him and may cause unnecessary issues for us. If something needs to be discussed regarding [Father] or the children please, contact [Grandmother] or myself and if you need proof of the conservatorship we will be glad to provide that.

Around this time, Mother remarried.

The lack of visitation or contact continued into 2014. In May 2014, Father was arrested for a disturbance in the parking lot of a fast food restaurant. Father refused to leave the premises after requests by the store manager and by police officers, leading to a physical altercation between Father and several officers. Father was charged with disorderly conduct, criminal trespass, resisting arrest, and simple assault. After spending about three months in jail, Father was admitted to another mental health institute in August 2014 for a court-ordered evaluation of his competency to stand trial. Father was "selectively mute" and uncooperative during his evaluation, but he did not evidence any behavior that indicated an imminent threat of harm to self or others or suggest that he was unable to appreciate the wrongfulness of his actions. Accordingly, Father did not meet the criteria for commitment, and he was discharged back to jail on September 9, 2014. Soon after, Father got out of jail and returned to live with Grandparents.

On September 23, 2014, Mother and her husband ("Stepfather") filed a petition for termination of Father's parental rights and for adoption by Stepfather.[3] By this time, the children were ages eight and seven, and they had not seen Father since the last supervised visit at the Exchange Club seventeen months earlier. The petition alleged that grounds existed to terminate Father's parental rights due to willful abandonment and mental incompetence. The petition further alleged that termination of Father's parental rights

---

[3]The petition states that Mother joined in the petition for the purpose of consenting to adoption.

was in the best interest of the children. The trial court appointed an attorney for Father and a guardian ad litem for the children.

One week later, on September 30, 2014, Father was arrested and charged with driving under the influence because he admittedly drove after drinking several margaritas at a restaurant. On May 31, 2015, police officers responded to a report of a suspicious person and found Father trying to get inside the locked doors of a nursing home. Father was delusional and believed he was in danger from "a radiation bomb." The police officers returned Father to Grandparents' home. Later that night, Father jumped in Grandparents' car and drove away on his own. He was found by a sheriff's deputy two hours away at a farm owned by Grandparents in Hardin County, Tennessee. Father was barefoot and walking down the middle of a road at 4 a.m. Father told the sheriff's deputy about the radiation bomb, and he was taken to jail. The next day, Father was again admitted to a mental hospital. Grandfather insisted that Father be required to abide by a mandatory outpatient treatment ("MOT") agreement upon release. Pursuant to that agreement, Father was required to receive his medications monthly by injection or else he would be picked up by the police and returned to the mental hospital. Upon his release, Grandparents arranged for Father to reside alone at a house they owned near their farm.

Meanwhile, Grandparents were permitted to participate in the parental termination case in their roles as co-conservators with their own attorney in order to assist Father in defending the lawsuit, even though an attorney was also appointed for Father. Mother filed a motion to require Father to submit to a mental examination pursuant to Tennessee Rule of Civil Procedure 35.01, citing his most recent release from the mental hospital and history of mental illness. A consent order was entered providing that a forensic custodial evaluation was necessary and that Dr. Paul Leonard, Ph.D., was appropriate to perform such services.

Dr. Leonard performed a forensic psychological parental access evaluation. He met with Father on two occasions in June and August 2016. Father partially completed a questionnaire and answered questions during the interviews. However, Father flatly refused to participate in the psychological tests that Dr. Leonard attempted to administer. Dr. Leonard reviewed Father's extensive mental health records and conducted interviews of Mother, Stepfather, Grandparents, and the children. In his report, Dr. Leonard ultimately concluded that Father met the diagnostic criteria for schizophrenia, paranoid-type. Dr. Leonard found that Father was not in an appropriate mental state to exercise supervised visitation after the divorce in 2012. He also found that while Father's MOT program currently ensured that he was medicated, this minimized but did not eliminate

his paranoid delusions. Dr. Leonard further concluded that the mandated medication regimen did not improve Father's poor judgment or antisocial attitudes and tendencies. Dr. Leonard found that Father's behavior was not fully explained by his schizophrenia and that he also met the diagnostic criteria for antisocial personality disorder. Dr. Leonard noted Father's twenty-year history of involvement with the police including several violent incidents, disregard for authority across various settings, aggressiveness, rationalization of hurting others, and lack of remorse. Because of these diagnoses and Father's criminal history, Dr. Leonard concluded that Father was not capable of parenting at the present time. And, based on all the evidence, Dr. Leonard opined that Father was not presently in an appropriate mental state to exercise either unsupervised or supervised parenting time with the children, nor would he be in the foreseeable future. Dr. Leonard's report was dated September 12, 2016.

The trial court conducted a two-day bench trial in May 2017. Father did not attend the trial based on the advice of his psychologist, Dr. Leite. The trial court heard live testimony from nine witnesses, including Dr. Leite, the Director of Visitation from the Exchange Club, Grandmother, Grandfather, Mother, Stepfather, Mother's sister, Stepfather's mother, and a neighbor. The trial court also received into evidence the evidentiary depositions of Dr. Leonard and the therapist who treated the children, in addition to numerous exhibits. By the time of trial, the children were ages 11 and 10. They had not lived with Father in seven years, since Mother left the marital home in 2010 when the children were ages 3 and 2. During that seven years of separation, the children had only seen Father during the eight supervised visits at the Exchange Club, which totaled less than eight hours. The children had not had any contact with Father since those visits ended in April 2013, four years before trial. Father had never paid child support or sent gifts for the children. However, days before trial, Mother received a lump sum check with retroactive disability benefits for the children based on Father's application.

According to Dr. Leonard's testimony from his evidentiary deposition introduced at trial, Father was quite often delusional during his interviews for the forensic psychological parental access evaluation. He denied objective facts, repeatedly blamed Mother for keeping the children from him, and suggested that he was the victim in this situation. With twenty-five years in practice, Dr. Leonard said, "In all the years I've been evaluating people, he was probably at the top of the list of showing what's called 'pathological denial.' 'Not my fault. Her fault. His fault.'" According to Dr. Leonard, Father exhibited frustration with his MOT program, the injections, and negative side effects and debated whether he should continue with it. Dr. Leonard testified that Father failed to recognize what would happen if he stopped taking his medication. Dr. Leonard

was also very concerned about Father's continued use of marijuana and alcohol.  He said that Father had "tenuous self-control" already and certainly did not need any less.

Dr. Leonard believed that Father's failure to follow the rules at the Exchange Club reflected both his schizophrenia and his antisocial personality disorder.  He explained that sometimes Father does not acknowledge the rules by his delusions, but often times, he chooses not to follow them.  Even considering Father's MOT program participation, Dr. Leonard believed that restarting visits would be "a huge risk" due to the likelihood that Father would "act out."  When Dr. Leonard was asked why supervised visitation would be bad for the children, he said, "most importantly, [Father] showed no interest in complying with the rules, making amends, restarting. And that was right from the horse's mouth."  According to Dr. Leonard, Father had "no present motivation," giving Dr. Leonard no reason to believe that supervised visitation would end any differently than it did the first time.  Father's description of how he would conduct himself at visitation was troubling to Dr. Leonard and a very important part of Dr. Leonard's decision-making process.  Father did not believe he needed any oversight and did not seem to respect any rules that would be imposed.  Dr. Leonard opined that Father should not be allowed supervised visits in part due to statements that he might make about Mother.  Father made it clear to Dr. Leonard that he was going to visit with his children "and say whatever I want and do whatever I want."  Dr. Leonard said, "I think right now and in the immediate future he doesn't seem to be able or willing to have any kind of emotionally healthy relationship with them."

Dr. Leonard acknowledged that during his interview with Son, Son repeatedly expressed a desire to have contact with Father.  However, Dr. Leonard also emphasized that "what children want and what is good for them is not the same thing."  Daughter indicated that she was scared and confused during her last visit with Father at the Exchange Club, and Dr. Leonard believed she was afraid of Father and especially his unpredictability.

Dr. Leite, who is a clinical psychologist, testified that he first had contact with Father in 2010, soon after Mother left the marital home.  Dr. Leite was consulted and diagnosed Father as paranoid schizophrenic.  Dr. Leite explained that Father suffered from delusions of persecution, believing that various family members and governmental officials were actively trying to kill him.  Since 2010, Dr. Leite had seen Father "episodically," at various times, and as an "ongoing consultant" for the family, but he had not treated him consistently or conducted any formal evaluations of Father.  Dr. Leite testified that the primary treatment for schizophrenia is antipsychotic medication that

unfortunately involves very negative side effects. Dr. Leite explained that stressors of any kind can exacerbate the symptoms of schizophrenia and that Father's coping abilities are poor as a result of his illness.

Although Dr. Leite wrote the letter in 2012 saying he was quite comfortable that Father was in an appropriate mental state to exercise supervised parenting time, in hindsight, Dr. Leite opined that the supervised visitation was probably extremely difficult for Father because of his difficulties with medication management at that time. Dr. Leite suggested that visitation should have occurred in a therapeutic setting with a therapist present. Dr. Leite had observed gradual improvement with Father since he had been on the mandated medication program and believed that he would continue to improve. However, Dr. Leite still recommended against Father attending the termination trial because it would be an incredible stressor for him and upset him. Dr. Leite explained that Father was not presently experiencing active delusions and that he was "functional at a level that does not require hospitalization," but that he was still impaired. Like Dr. Leonard, Dr. Leite opined that Father could not presently exercise unsupervised parenting time with the children. Unlike Dr. Leonard, however, Dr. Leite believed that Father was ready to start working toward a "family therapy interaction" with the children. Dr. Leite suggested beginning with individual therapy aimed at prepping Father for the interaction, followed by a very gradual and limited reintroduction with therapeutic observation, intervention, and supervision, family therapy, and a variety of other parameters. This would have to be successful before Dr. Leite would even consider the possibility of unsupervised parenting time. Dr. Leite testified that it was unlikely that Father would be capable of unsupervised parenting time in the next year or in the near future. He said that unsupervised parenting time would be a possibility "in the next years" but reiterated that "it's just that," a possibility.

Dr. Leite also acknowledged that Father continued to use marijuana and alcohol and that both substances negatively impact his medications and mental condition. Dr. Leite testified that it would be important to condition Father's contact with the children on ending his marijuana and alcohol use and becoming sober in order to determine whether Father was motivated to address his issues and be a part of the children's lives. Dr. Leite said, "His motivation and willingness to engage in that kind of a program would tell me a lot about what kind of advancement he might be able to make." If Father was unwilling to participate in such a program, "that would certainly be a cause for concern in terms of any prognosis for him." In sum, Dr. Leite testified that there were a lot of "ifs" that would need to occur in order for Father to ever have unsupervised parenting time.

Dr. Leite had never met the children and could not testify as to what would be best for them. Mother testified that the children were doing very well, making As and Bs in school and getting along very well with Stepfather and the siblings in their blended family. Stepfather testified about coaching the children's sports teams and said he had never missed a parent-teacher meeting at their school. The children call him "daddy." The children had been in counseling since the divorce proceeding five years earlier. During her evidentiary deposition, the children's therapist testified that the children have very secure attachments to Mother and Stepfather and are emotionally healthy "as much as they can be." Early on, Son had struggled with anger issues and physical violence toward Mother, and the children had experienced some mixed emotions about Father and the concept of adoption. Ultimately, however, the therapist had no concerns about the adoption and described both children as very happy, thriving, and well-adjusted children.

Mother testified that her motivation for pursuing adoption was to provide the children with stability and assurances regarding their future. Mother was concerned that if something were to happen to her, the children would be embroiled in a custody battle between her family and Father's family. Mother was not in favor of beginning supervised visitation due to the past experience at the Exchange Club. She questioned whether Father would even been willing to try supervised visitation, noting that during his deposition in this case, Father said he was unwilling to continue with additional supervised visitation. Mother testified that the children were very upset by the Exchange Club visitation and especially after the last visit. She described it as an emotional roller coaster for the children and said they were relieved when they did not have to return.

Grandmother described delusional and troubling behavior exhibited by Father while he was living in her home. She believed that Father's mental condition deteriorated during the period of supervised visitation at the Exchange Club because he was very agitated about the parameters of visitation, which in his mind were very restrictive. She explained that any demonstration of authority seemed to make Father overly anxious and upset. According to Grandmother, Father believed that he was being asked to apologize to the visitation supervisor at the Exchange Club after the final visit, not the children. However, even after she and Grandfather were appointed as co-conservators, they did not seek supervised visitation for Father because they did not feel that he had the capacity to participate at that time. Grandmother explained that if Father was unable to deal with his own daily routine, he did not need to have visits with the children. Grandmother conceded that Father had been verbally abusive to her and somewhat physically abusive "if you count pushing." Grandmother believed Father had improved since he was placed on the MOT program and testified that he had begun

10

helping Grandfather by working on his farm. However, she agreed that Father still was not mentally capable of caring for the children on his own.

Grandfather also testified about Father's delusional behavior and arrest history. Grandfather conceded that he had at times been in fear for his safety because of Father's extremely delusional and totally irrational behavior. At the time of trial, Father was still residing alone near Grandfather's farm, but Grandfather visited Father nearly every day and paid for all of Father's financial needs. Father had been subject to the MOT program for one year and nine months. Grandfather explained that Father has such dislike for the mental hospital that it serves as a huge incentive for him to comply with the MOT program because he will be escorted by police back to the hospital in the event of noncompliance. Grandfather believed that Father's schizophrenia was presently controlled by the mandated medication, but he acknowledged that Father still was not employable and not in a position to attend the termination trial. Grandfather believed that Father would be "extremely stressed" by visiting the children in a normal situation but that he could visit with the children with proper preparation under the circumstances described by Dr. Leite. But, Grandfather acknowledged that Father would not be able to resume caring for the children in the near future.

On June 8, 2017, the trial court entered a written order terminating Father's parental rights on the ground of mental incompetence. *See* Tenn. Code Ann. § 36-1-113(g)(8). Because this single ground for termination had been proven, the trial court deemed it unnecessary to rule on the other ground alleged – abandonment by willful failure to visit and/or support. Father filed a notice of appeal. This Court entered an order directing the parties to obtain a final judgment resolving the remaining ground for termination. As a result, the trial court entered an amended order terminating Father's parental rights on the grounds of mental incompetence and abandonment by willful failure to visit and support.

## II. ISSUES PRESENTED

Father presents the following issues, as slightly reworded, for review on appeal:

1.  Whether the trial court erred in ruling that Father abandoned his children by willfully failing to pay child support and/or willfully failing to visit;

11

2. Whether the trial court erred in finding clear and convincing evidence that Father's parental rights should be terminated due to his mental disability;

3. Whether clear and convincing evidence supports the finding that termination of Father's parental rights is in the best interest of the children.

For the following reasons, we reverse the trial court's finding regarding abandonment but otherwise affirm the trial court's order terminating Father's parental rights.

## III. STANDARD OF REVIEW

"In Tennessee, proceedings to terminate parental rights are governed by statute." *In re Kaliyah S.*, 455 S.W.3d 533, 541 (Tenn. 2015). Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *Id.* at 546. Pursuant to the statute, parties who have standing to seek termination of parental rights must prove two elements. *Id.* at 552. First, they must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *Id.*

Because of the "constitutional dimension of the rights at stake in a termination proceeding," the petitioner must prove both of these elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). "Clear and convincing evidence" has been defined as "'evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (quoting *In re Valentine*, 79 S.W.3d at 546). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

Due to the heightened burden of proof in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). First, we review the trial court's factual findings de novo in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Adoption of Angela E.*, 402 S.W.3d at

639. Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016) (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

### A. *Mental Incompetence*

Pursuant to Tennessee Code Annotated section 36-1-113(g)(8)(B)(i), one ground for terminating parental rights exists if clear and convincing evidence establishes that:

> The parent [] of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's [] mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent [] will be able to assume or resume the care of and responsibility for the child in the near future[.]

No willfulness in the failure of the parent to establish an ability to care for the child need be shown. Tenn. Code Ann. § 36-1-113(g)(8)(C). "[T]he General Assembly has determined that a parent's inability to adequately care for and supervise a child constitutes a just basis for termination of parental rights, even though such inability is not the result of willful conduct by the parent." *In re M.E.W.*, No. M2003-01739-COA-R3-PT, 2004 WL 865840, at *7 (Tenn. Ct. App. Apr. 21, 2004).

Father's brief on appeal states, "There is no debate on whether [Father] is mentally disabled." Through counsel, Father stipulates to his "mental incompetence." Still, he insists that the trial court failed to properly apply caselaw regarding the statutory ground of mental incompetence and failed to properly interpret the statutory scheme when terminating his parental rights. Father and Grandparents raise several related arguments regarding this ground for termination.

## 1. Ability to Assume "Care"

First, Father questions whether it is necessary for him to be able to assume *care* of the children. Father admits that he "has not progressed to the point that he is able to independently provide care to his children if necessary." However, Father argues that he should not be required to demonstrate an ability to assume care of the children because the children are in a stable home with Mother and their needs are currently being met by Mother and Stepfather. Father suggests that the statutory language about whether he can assume "the care of and responsibility for" the children would be relevant if his children were in foster care but that it should not apply when the children are already being cared for in a stable home. Essentially, Father suggests that his children are not in need of care by him because they are in the care of Mother. Father claims that because the statute references providing "further care," it implies that care is currently being provided unsuccessfully and that the child is in need of further care. According to Father, because the children are in a good home, there is no need and "no requirement[] that he be able to shoulder parental responsibility." He suggests that providing "supervised care" should suffice.

This is simply a strained interpretation of the statute that is unsupported by the statutory text. This ground for termination specifically requires consideration of whether the parent "is incompetent to adequately provide for the further *care and supervision of* the child" and whether the parent "will be able to assume or resume *the care of and responsibility for* the child in the near future." Tenn. Code Ann. § 36-1-113(g)(8)(B)(i). (emphasis added). When applying this ground, Tennessee courts have consistently held that "'[a] parent's continued incapacity to provide fundamental care for a child, whether caused by mental illness, mental impairment, or some other cause constitutes sufficient ground for termination of parental rights.'" *In re Eric G.*, No. E2017-00188-COA-R3-PT, 2017 WL 4844378, at *11 (Tenn. Ct. App. Oct. 25, 2017) (*no perm. app. filed*) (quoting *In re M.E.W.*, 2004 WL 865840, at *7). The statute "'serves to protect children from harm caused by a parent who is incapable of safely caring for them.'" *In re Lena G.*, No. E2016-00798-COA-R3-PT, 2017 WL 2304448, at *25 (Tenn. Ct. App. May 26, 2017) (*no perm. app. filed*) (quoting *In re D.A.P.*, No. E2007-02567-COA-R3-PT, 2008 WL 2687569, at *5 (Tenn. Ct. App. July 9, 2008)). For instance, in *In re Lillian D.*, No. E2016-00111-COA-R3-PT, 2016 WL 4505691, at *5 (Tenn. Ct. App. Aug. 26, 2016), a mother was successfully attending supervised visits, but her mental condition prevented the supervisor from recommending unsupervised visitation. We affirmed termination of the mother's parental rights based on mental incompetence, as she was, pursuant to the statute, "incompetent to adequately provide for the care and supervision of the Child" and unlikely to be able "to assume care of and responsibility for the Child in the near future."

*Id.* at *12.   Likewise, in *In re B.L.S.C.*, No. M2008-02301-COA-R3-PT, 2009 WL 971286, at *8 (Tenn. Ct. App. Apr. 7, 2009), we found that a mother's behavior during supervised visitation was commendable, but that it "[did] not negate the clear and convincing evidence that [she] cannot consistently care for her children in an unsupervised, unstructured setting."

In *State Dep't of Children's Servs. v. Oliver*, No. M2007-00844-COA-R3-PT, 2007 WL 4553036, at *8 (Tenn. Ct. App. Dec. 26, 2007), the parents had "striven mightily to overcome their obstacles to parenting competently" and visited their children regularly.   Despite those efforts, however, we affirmed termination because the parents were simply unable mentally to care for their children.   *Id.*   We acknowledged that sometimes "'parents may recognize that they are unable to shoulder the responsibility of caring for the child, but wish for a relationship with the child that does not require caring for the child's needs.'"   *Id.* (citation omitted).   However, the statutory purpose is to determine whether the child would be able to safely live with the parents.   *Id.*

> [T]he focus of the termination statute is on whether the child can safely live with the parent and have his, that is, the child's, day-to-day needs met. Some of the grounds [for termination], such as abuse of the child, are reasons for which the parent can be faulted. Other reasons, such as a parent's mental incompetence, are reasons for which the parent cannot be faulted, but the result nonetheless is that the child cannot safely live with the parent in such a way that the child's needs will be met.

*Id.* (quotation omitted).   "The legislative intent is not simply to establish a 'meaningful relationship' between a child and his or her parents; it is much more than that.   It is to return the child to the *care* of his parents."   *State Dep't of Children's Servs. v. D.G.B.*, No. E2001-02426-COA-R3-JV, 2002 WL 31014838, at *9 (Tenn. Ct. App. Sept. 10, 2002).   Thus, the "key" issue is whether an early return to the *care* of the parent is possible.   *Id.*   "[C]hildren need and deserve a parent who can take care of them."   *State, Dep't of Children's Servs. v. Mims*, 285 S.W.3d 435, 449 (Tenn. Ct. App. 2008).

Despite the arguments raised on appeal, the focus of this ground for termination is not whether the children are currently well-cared for or the circumstances of that care.   It is on Father and his ability or inability to care for the children.   We reject the assertion from Father and Grandparents that Father should not be required to be able to provide care for the children.

## 2.    Stand-alone Ground

Next, Father argues that the trial court misconstrued caselaw regarding this statutory ground for termination.  Father claims that the ground of mental incompetence is not a ground that can "stand on its own" and that it must be "coupled with" another ground for termination.  Father claims that he was unable to find any caselaw or statutory law providing for termination of parental rights solely on the ground of mental incompetence.

The termination statute provides that termination of parental rights "may be based upon any of the grounds listed in [] subsection (g)." Tenn. Code Ann. § 36-1-113(g).  In other words, "the existence of any one ground for termination is enough." *In re M.A.A.K.*, No. E2010-01318-COA-R3-PT, 2010 WL 4342154, at *4 (Tenn. Ct. App. Nov. 3, 2010).  This applies equally to the ground of mental incompetence. *See, e.g., In re Madison A.*, No. E2008-01261-COA-R3-PT, 2008 WL 5423999, at *5 (Tenn. Ct. App. Dec. 30, 2008) (affirming termination where the only ground pursued at trial and considered on appeal was mental incompetence); *Mims*, 285 S.W.3d at 449 (affirming termination based solely on mental incompetence and declining to consider another ground because only one ground was necessary to support termination).  Father's argument to the contrary lacks merit.

## 3.    Persistent Conditions Analysis

Next, Father argues that the ground of mental incompetence should be analyzed like the ground of persistent conditions and in accordance with the reasoning of *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).  The ground commonly referred to as "persistent conditions" is a separate stand-alone ground in the termination statute. *See* Tenn. Code Ann. § 36-1-113(g)(3).  It applies when:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
>> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

*Id.* Notably, the ground of persistent conditions begins by stating a prerequisite that the child at issue "has been removed from the home of the parent or guardian by order of a court." *Id.* In *In re Audrey S.*, 182 S.W.3d at 872, this Court explained that additional language used in the statute further limits the scope of this ground for termination. Specifically, the statute goes on to reference the original "conditions that led to the child's removal" and other conditions that "would cause the child to be subjected to further abuse or neglect." Tenn. Code Ann. § 36-1-113(g)(3). Consequently, we concluded that the persistent conditions ground is applicable "only where the prior court order of removal was based on a judicial finding of abuse or neglect." *In re Audrey S.*, 182 S.W.3d at 872.

According to Father, "[t]his reasoning is applicable to the language found in the mental incompetence statute" as well because the ground of mental incompetence requires consideration of whether the parent can "assume or resume" the care of the child. Father interprets this language to mean that the statute only applies in the case of a prior *removal* from the parent based on abuse, dependency, or neglect. Like Father, Grandparents argue that the statute "implicitly" requires an action brought by DCS in which the child has been removed from the care of the parent and placed in state custody because the mental incompetence ground references whether the parent "will be able to assume or resume the care of and responsibility for the child in the near future." Grandparents claim that Tennessee cases applying this ground for termination have involved petitions for termination filed by DCS and not step-parents. They argue that this ground for termination "was never meant to apply to non-departmental petitions, such as petitions filed by step-parents for termination and adoption." Thus, Grandparents and Father urge this Court to hold that the ground of mental incompetence is inapplicable to this matter.

Again, the statutory language, read in context, simply does not support this interpretation. The ground of mental incompetence exists if:

> The parent [] is incompetent to adequately provide for the further care and supervision of the child because the parent's [] mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent [] will be able to assume or resume the care of and responsibility for the child in the near future.

Tenn. Code Ann. § 36-1-113(g)(8)(B)(i). Unlike the ground of persistent conditions, the ground of mental incompetence does not contain a prerequisite of a prior court order removing the child from the home of the parent, nor does it mention "conditions that led to the child's removal" or "further abuse or neglect," phrases specifically included for the ground of persistent conditions. Tenn. Code Ann. § 36-1-113(g)(3). The statutory text provides no basis for reading those requirements into this statute.

The language about assuming or resuming care does not compel that result either. For the ground of mental incompetence, the petitioner bears the burden of demonstrating both that the parent is *presently* unable to provide further care for the child and that it is unlikely that the parent will be able to assume the care of the child *in the near future* because of mental impairment. *In re Tanya G.*, No. E2016-02451-COA-R3-PT, 2017 WL 2895935, at *3 (Tenn. Ct. App. July 7, 2017) (*no perm. app. filed*); *In re La'Trianna W.*, No. E2016-01322-COA-R3-PT, 2016 WL 7175288, at *5 (Tenn. Ct. App. Dec. 9, 2016) (*no perm. app. filed*). Simply put, we must consider the parent's present ability to care for the child and the likelihood that he or she can assume care in the near future. However, nothing in the statute requires removal by DCS or a previous finding of dependency and neglect or abuse, as suggested by Father and Grandparents. Contrary to the arguments presented on appeal, Tennessee appellate courts have in fact affirmed termination of parental rights based on the ground of mental incompetence in cases that were filed by stepparents or private parties rather than DCS. *See, e.g.*, *In re Joseph F.*, 492 S.W.3d 690, 693 (Tenn. Ct. App. 2016) (involving a termination petition filed by individuals with physical custody of the children, not DCS); *In re Erykah C.*, No. E2012-02278-COA-R3-PT, 2013 WL 1876011, at *1 (Tenn. Ct. App. May 6, 2013) (involving a termination petition filed by adoptive parents). We discern no merit in the arguments raised on appeal regarding these issues.

### 4. Father's Condition

Finally, Grandparents argue that the trial court erred in finding clear and convincing evidence that Father's condition was so likely to remain impaired that it was unlikely that he would be able to provide care to the children in the near future. They

note the fact that Father's condition was improving due to the MOT program. Grandparents criticize the report of Dr. Leonard as "clearly erroneous" and insist that Dr. Leite recognized "a possibility that in the next year, Father would be capable of unsupervised parenting time." However, this is a mischaracterization of Dr. Leite's testimony. The cited testimony was as follows:

> Q. Is there a possibility that in the next year [Father] would be capable of custodial care?
>
> A. If "custodial" means unsupervised 24/7 or 24/two or three days, I would say unlikely. I think it could certainly be something to work toward, but I'd want to see a progression from limited contact, supervised therapeutic contact, family therapy, a variety of things before I'd feel comfortable making a recommendation like that or seeing that as a possibility.
>
> Q. Is there a likelihood that in the next years [Father] would be capable of unsupervised parenting time?
>
> A. Possibility. But I'd say it's just that.

And, once again, Dr. Leonard opined that Father's mental condition was so impaired that he could not assume care of the children in the near future. We perceive no basis for discounting Dr. Leonard's opinion.

Tennessee courts have "rejected the argument that the ground of mental incompetence is reserved only for parents who have a condition for which no amount of intervention can assist." *In re Lena G.*, 2017 WL 2304448, at *25 (quoting *State, Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 337 (Tenn. 1990)). To the contrary, we have "affirmed the termination of parental rights for mental disorders such as bipolar disorder, adjustment disorder with anxiety and depressed mood, dependent personality disorder, and schizophrenia disorder" when the parent's mental condition impairs the parent to an extent that he or she cannot adequately provide for the care and supervision of the child. *Id.* The evidence in the record reflects that Father's mental condition has been impaired at least since Mother left the marital home in 2010 and that it was not likely to improve in a short time, even with mandated medication, to the point that he could care for the children. The evidence shows clearly and convincingly that Father's impaired mental condition presently prevents him from providing care for the children and would prevent him from assuming the care of and responsibility for the children in the near future. Accordingly, the record supports the trial court's finding that the ground of mental incompetence was proven by clear and convincing evidence.

19

### B. Abandonment

Next, we turn to the issue of abandonment. According to the termination statute, another ground for termination exists if "[a]bandonment by the parent or guardian, as defined in § 36-1-102, has occurred." Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated section 36-1-102 provides five alternative definitions of abandonment. The first definition provides that abandonment occurs when the parent willfully failed to visit or support the child "[f]or a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent." Tenn. Code Ann. § 36-1-102(1)(A)(i). However, a different definition applies if the parent "is incarcerated at the time of the institution of an action" or "has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action[.]" Tenn. Code Ann. § 36-1-102(1)(A)(iv).

Here, the petition for termination asserted that Father had "willfully abandoned the said minor children, as defined by T.C.A. § 36-1-102, for more than four (4) consecutive months immediately preceding the filing of this petition."[4] At trial, counsel for Mother and Stepfather said during opening statements,

> As your Honor knows and I've pointed out in the statute in my memorandum, that the operative timeframe is the four-month period preceding the filing of the petition for adoption. In this case, the petition for adoption was filed on September 23rd, 2014, which would make the operative timeframe the four-month period leading up to the filing. So that would be May of 2014 to September of 2014.

As the trial progressed, the testimony established that Father was arrested for the incident at the fast food restaurant in May 2014 and spent the next few months in jail and being evaluated at a mental health institute. He was released shortly before the termination petition was filed. The fact that the petitioner was pursuing termination based on the wrong four-month period apparently went unnoticed. During closing arguments, the trial

---

[4]Although the language in the termination petition was vague and did not specify a particular statutory definition of abandonment, Stepfather and Mother state in their brief on appeal that they "did not base their abandonment claim on the fact that Father was incarcerated" as they "did not even know that Father had been incarcerated in the months leading up to the filing of their Petition."

judge appeared to recognize the issue. After indicating that the dates of incarceration were unclear to him, the trial judge said,

> My only question – what my request from each of y'all is, if you have proof or evidence as to when he was incarcerated and what -- in regards to the four-month period of time that is the serious time that we're talking about here, I'd like to know what it is. And if you can get that to me sometime in the near future, we'll see what we can do.
>
> . . . .
>
> . . . . But if they're incarcerated during that four-month period of time or during a portion of that four-month period of time, I have an interest in that.

The trial court's final amended order ultimately terminated Father's parental rights based on abandonment by willful failure to visit and willful failure to support. The court found that during the four-month period immediately preceding the filing of the termination petition, Father was arrested and spent time in a mental health facility. As a result, the court deemed that four-month period irrelevant and found that the termination statute set forth a different relevant timeframe that applies under the facts of this case. The court cited the definition of abandonment listed in subsection (iv) for incarcerated parents and reviewed the four-month period prior to Father's incarceration -- from January 8 to May 8, 2014 -- for purposes of determining whether abandonment occurred. The court found that Father willfully failed to visit or support during that four-month period and terminated Father's parental rights on that basis.

On appeal, Grandparents argue that the trial court erred in deciding *sua sponte* to rely on the definition of abandonment in subsection (iv) for incarcerated parents, as it was not mentioned in the termination petition or at trial. Grandparents argue that the trial court cannot simply substitute one definition of abandonment for another when making its ruling. We agree. We examined the effect of pursuing termination based on the wrong four-month period in *In re D.H.B.*, No. E2014-00063-COA-R3-PT, 2015 WL 1870303, at *4-5 (Tenn. Ct. App. Apr. 23, 2015). In that case, the original petition alleged only "abandonment" of the children. When pressed for more specificity, the petitioners amended the petition to allege abandonment during the four-month period immediately preceding the filing of the petition. However, the proof at trial demonstrated that the mother was incarcerated during that period, and the trial court applied the definition applicable to incarcerated parents. The Court of Appeals explained that "courts must strictly apply the procedural requirements in cases involving the termination of parental rights." *Id.* at *4 (citation omitted). The termination statute is very specific in

defining the period applicable to incarcerated parents. *Id.* We also acknowledged previous caselaw deeming a termination petition "deficient where the 'wrong' four-month statutory period is pleaded." *Id.* at *5 (quoting *In re K.N.B.*, No. E2014-00191-COA-R3-PT, 2014 WL 4908505, at *13 (Tenn. Ct. App. Sep. 30, 2014)). Because the petition did not properly allege the relevant time period of four months preceding the parent's incarceration, we found it necessary to consider whether the ground of abandonment by an incarcerated parent was tried by implied consent. *Id.* We concluded that the alternative ground was tried by consent because the trial court "shifted its focus to the 'correct' statutory period" during the trial, and the mother fully understood that the unpled ground for termination was being tried. *Id.* at *8.

We do not reach the same result under the facts of this case. No one appeared to recognize that the wrong four-month period was being tried except the trial judge, and that was during closing arguments. Even at that point, the attorneys did not appear to recognize the issue. Because the ground of abandonment by an incarcerated parent was neither properly pleaded nor tried by consent, we reverse the trial court's judgment terminating Father's parental rights on this ground. *See In re K.N.B.*, 2014 WL 4908505, at *13; *see also In re A.E.T.*, No. M2015-01193-COA-R3-PT, 2016 WL 4056467, at *4 (Tenn. Ct. App. July 26, 2016) (*no perm. app. filed*) ("Because of the fundamental nature of parental rights, courts must take a very strict view of procedural omissions that could put a parent at a disadvantage in preparing for trial.").

## C.    Best Interest

Tennessee Code Annotated section 36-1-113(i) provides a list of factors that are relevant when deciding what is in a child's best interest. However, the list is not exhaustive, and the court is not required to find the existence of every factor before concluding that termination is in a child's best interest. *In re Joseph F.*, 492 S.W.3d at 706. The child's best interest must be viewed from the child's perspective rather than that of the parent. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

In its best interest analysis, the trial court found that the children were ages eleven and ten, and it had been more than seven years since they resided with Father. During that seven years, the children had eight brief interactions with Father. The trial court found that "Father has not been a part of any facet of the children's lives." It also concluded that it was not in the best interest of the children to inject Father into their current environment. The court recognized the possibility that visitation might benefit Father, but it found no credible proof that such visitation would in any way serve the best

22

interest of the children. The trial court found that the nature, severity, and consequences of Father's mental illness led to the unmistakable conclusion that termination of his parental rights was appropriate.

From our careful review of the record, the evidence does not preponderate against the trial court's factual findings, and the combined weight of the facts amounts to clear and convincing evidence that termination of Father's parental rights is in the best interest of the children. Any remaining bond between Father and the children, if one exists, is outweighed by the safe and stable home environment the children now enjoy and the serious hazards that would be involved in returning the children to Father's care or even resuming supervised visitation between him and the children.

## V. CONCLUSION

For the aforementioned reasons, the decision of the chancery court is hereby reversed in part and affirmed in part. The request for attorney's fees on appeal made by Mother and Stepfather is respectfully denied, as they cite no basis for such an award. Any remaining issues are pretermitted. Costs of this appeal are taxed to the appellant, David R., for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE